FILED

2/11/2020

Clerk, U.S. District Court
District of Montana
Helena Division

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| NATIVE ECOSYSTEMS COUNCIL, | CV 18-157-BLG-SPW-TJC |
| Plaintiff, | |
| vs. | **ORDER** |
| DONATO JUDICE, Acting Associate State Director, Bureau of Land Management, Department of the Interior; *et al*, | |
| Defendants. | |

Plaintiff Native Ecosystems Council ("NEC") brings this action challenging Defendants' ("BLM") analyses and authorization of watershed projects for mechanical removal of conifers and prescribed burning of sagebrush habitat on lands managed by the BLM's Dillon, Montana Field Office.  (Doc. 1.)  Currently before the Court are the parties' cross-motions for summary judgment.  (Docs. 16 and 28.)  Having reviewed the parties' arguments and submissions, the Court makes the following findings and recommendations.

## I.   Background

The Dillon Field Office of the BLM adopted its current Resource Management Plan ("Dillon RMP" or "RMP") in 2006.  (RMP at 1.)  Among a multitude of goals, objectives, land use allocations, and management actions, the

1

RMP called for watershed evaluations to assess whether the Western Montana Standards for Rangeland Health were being met. (*Id.* at 11, 49.) The watershed assessments resulted in findings that sagebrush steppe habitat would be converted to forest habitat without intervention in four watersheds: Middle Ruby River ("Middle Ruby," cited as "MRRW"), Centennial (cited as "CW"), South Tobacco Root ("Tobacco Root," cited as "STRW"), and Blacktail (cited as "BTW"). (MRRW at 167; CW at 192; STRW at 279; BTW at 200.)

Environmental Assessments ("EA") were subsequently prepared for each watershed, with the stated objective to restore or maintain sagebrush communities in habitats with conifer expansion. (MRRW at 104; CW at 292; STRW at 155; BTW at 112.) Draft EAs for the watersheds were issued, and management alternatives included prescribed fire and/or mechanical treatments to reduce conifer encroachment on the sagebrush steppe habitat. (MRRW at 2, 11, 14; CW at 3, 15, 20; STRW at 3, 19, 24; BTW at 3, 4, 8.) After a comment period, a Notice of Final Decision was issued for each watershed, approving non-commercial mechanical timber and/or prescribed fire treatment. The Notice of Final Decision was issued on the Middle Ruby on December 4, 2014; the Centennial on November 16, 2015; the Tobacco Root on December 20, 2017; and the Blacktail on December 26, 2017. (MRRW at 2; CW at 2; STRW at 2; BTW at 2.)

Accompanying each of the Final Decisions was a Finding of No Significant Impact ("FONSI"), which was based on the watershed assessments and the EAs, explaining the rationale for the decision and associated findings.  (*See* MRRW at 20-21; CW at 27-30; STRW at 41-45; BTW at 23-26.)  These findings are ultimately at issue in this case.

While the NEPA process for the watersheds was ongoing, the Idaho State Office of BLM issued the Approved Resource Management Plan Amendment for Idaho and Southwestern Montana Greater Sage-Grouse in September 2015.  ("Sage Grouse Amendment" or "Amendment," cited as "SGRMP").  (*See* SGRMP at 1.)  The purpose of the Amendment was to:

> identify and incorporate appropriate measures in existing land use plans to conserve, enhance, and restore GRSG [greater sage grouse] habitat by avoiding, minimizing, or compensating for unavoidable impacts on GRSG habitat in the context of the BLM's multiple use and sustained yield mission under FLPMA. Changes in management of GRSG habitats are necessary to avoid the continued decline of populations across the species' range. This ARMPA focuses on areas affected by threats to GRSG habitat identified by the USFWS in the March 2010 listing decision and in the USFWS COT 2013 report.

(*Id.* at 19.)  The 2010 USFWS listing decision referenced in the Sage Grouse Amendment had identified "present or threatened destruction, modification, or curtailment" of sage grouse habitat and range, and inadequate "existing regulatory mechanisms," as posing "a significant threat" to sage grouse.  (*Id.* at 11.)  The 2013 USFWS "COT report," referenced in the Amendment made certain

recommendations; the "highest-level objective" among them was minimizing

threats to habitat.  (*Id.* at 497.)  Thus, the Sage Grouse Amendment effectively

amended the Dillon RMP to address the USFWS's 2010 Endangered Species Act

review and the 2013 COT report on threats to sage grouse and sage grouse habitat.

(*Id.* at 18.)

NEC brought this action under the Administrative Procedure Act ("APA")

and asserts that BLM's authorization of the watershed projects that include

sagebrush burning and conifer removal across southwestern Montana's sage grouse

habitat is arbitrary and capricious, an abuse of discretion, and/or otherwise not in

accordance with law.  (Doc. 1 at ¶ 2.)  NEC argues that prescribed burning to

remove conifers on sage grouse steppe habitat is a conventional management

approach that has proven detrimental to sage grouse, led to USFWS's listing in the

first place, and represents a "business as usual" approach that ignores best

available science.  (Doc. 18 at 12-13.)  Further, NEC states that prescribed burning

ignores the very procedural safeguards the Sage Grouse Amendment was designed

to implement, as well as ignores the studies and reports on which the Amendment

was based that identify rangeland fire as a primary risk to sage grouse habitat.  (*Id.*

at 13, 16-20.)

NEC's motion relies primarily on the RMP and the Sage Grouse

Amendment's respective commands that "[s]ites should not be burned" and

"prescribed fire will not be used in sagebrush steppe" unless certain criteria are addressed, analyzed, and conclude prescribed fire to be necessary.  (*Id.* at 20, 27.) NEC argues that BLM has failed to comply with the exceptions in their NEPA analysis in the four watershed treatment plans, and thus allowing for continued use of prescribed fire is arbitrary and capricious.  (*Id.* at 20-21.)

BLM first argues that NEC lacks standing to challenge BLM's watershed decisions.  (Doc. 30 at 21.)  Next, BLM moves to dismiss NEC's challenge to the Centennial EA as moot, because BLM admitted it was inconsistent with the Dillon RMP and withdrew it for additional NEPA analysis.  (*Id.* at 27.)  Lastly, BLM argues that the watershed decisions comply with NEPA, reflecting thorough analysis.  (*Id.* at 29.)

## II.    Legal Standards

### A.    NEPA and APA Standards of Review

NEPA is a procedural statute enacted to protect the environment by requiring government agencies to meet certain procedural safeguards before taking action that affects the environment.  *See Cal. Ex. rel. Lockyer v. US. Dept. of Agric.,* 575 F.3d 999, 1012 (9th Cir. 2009).  In other words, NEPA "force[s] agencies to publicly consider the environmental impacts of their actions before going forward."  *Idaho Sporting Cong., Inc. v. Rittenhouse,* 305 F.3d 957, 963 (9th Cir. 2002).

5

NEPA requires an agency proposing a major federal action significantly impacting the environment to prepare an environmental impact statement ("EIS") to analyze potential impacts and alternatives.  42 U.S.C. § 4332(C).  To determine whether an EIS is required, the agency typically first prepares an EA.  40 C.F.R. § 1501.4(b).  An EA is a "concise public document" that "include[s] brief discussions of the need for the proposal, of alternatives as required by [42 U.S.C. § 4332(2)(E)], of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted."  40 C.F.R. §§ 1508.9(a), (b); *Native Ecosystems Council v. U.S. Forest Serv.,* 428 F.3d 1233, 1239 (9th Cir. 2005).

Because NEPA does not contain a separate provision for judicial review, courts review an agency's compliance with NEPA under the APA (5 U.S.C. §§ 701-706).  5 U.S.C. § 706(2)(A).  Judicial review of administrative agency decisions under the APA is based on the administrative record compiled by the agency, not on independent fact-finding by the district court.  *Camp v. Pitts,* 411 U.S. 138, 142 (1973).

In reviewing an agency action under the APA, the Court must determine whether the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).  "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which

Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto Ins. Co.,* 463 U.S. 29, 43 (1983).

Review under this standard is narrow, and the reviewing court may not substitute its judgment for that of the agency. *Id.* Review is highly deferential to the agency's expertise and presumes the agency action to be valid. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-16 (1971), *abrogated in part on other grounds in Califano v. Sanders*, 430 U.S. 99, 105 (1977); *Arkansas v. Oklahoma,* 503 U.S. 91, 112 (1992); *Earth Island Inst. v. Elliott*, 318 F. Supp. 3d 1155, 1166 (E.D. Cal. 2018), *appeal dismissed as moot*, 775 F. App'x 312 (9th Cir. 2019). Nevertheless, the agency must articulate a rational connection between the relevant data and articulate a satisfactory explanation for its action, including a "rational connection between the facts found and the choice made." *Id.*; *see also Midwater Trawlers Co-op v. Dep't of Commerce,* 282 F.3d 710, 716 (9th Cir. 2002). Thus, the reviewing court must look at whether the decision considered all the relevant factors or whether the decision was a clear error of judgment. *Id.*

Judicial review under the APA of a NEPA action is limited to whether the agency "took a 'hard look' at the environmental impacts of a proposed action."

7

*Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1072

(9th Cir. 2010).  A "hard look" under NEPA requires consideration of all

foreseeable direct and indirect impacts.  *Idaho Sporting Congress, Inc.*, 305 F.3d at

973.  A hard look should involve a discussion of adverse impacts that does not

improperly minimize negative side effects.  *Native Ecosystems Council*, 428 F.3d

at 1241.  "General statements about possible effects and some risk do not

constitute a hard look absent a justification regarding why more definitive

information could not be provided."  *Conservation Cong. v. Finely*, 774 F.3d 611,

621 (9th Cir. 2014).  Once the court is "satisfied that a proposing agency has taken

a hard look at a decision's environmental consequences, [its] review is at an end."

*Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1519 (9th Cir. 1992).

## B.    Summary Judgment Standard

Courts may resolve APA challenges via summary judgment.  *See Nw.*

*Motorcycle Ass'n v. United States Dep't Agric.,* 18 F.3d 1468, 1472 (9th Cir.

1994).  In such a summary judgment proceeding, the function of a district court is

to determine whether as a matter of law the evidence in the administrative record

permitted the agency to make its decision.  *Occidental Eng'g Co. v. I.N.S.*, 753

F.2d 766, 769 (9th Cir. 1985); *Sierra Club v. Mainella*, 459 F.Supp.2d 76, 90

(D.D.C. 2006).  Review of a final agency decision does not require fact finding on

behalf of a district court.  *Nw. Motorcycle Ass'n*, 18 F.3d at 1472.  Thus, summary

judgment used for the purposes of reviewing a decision of an administrative agency, which itself is the finder of fact, is appropriate in determining "the legal question of whether the agency could reasonably have found the facts as it did." *Occidental Eng'g Co.*, 753 F.2d at 770; *Fid. Expl. & Prod. Co. v. Bernhardt*, No. CV16167BLGSPWTJC, 2019 WL 2029482, at *3 (D. Mont. Jan. 24, 2019), *report and recommendation adopted*, No. CV 16-167-BLG-SPW, 2019 WL 1149975 (D. Mont. Mar. 13, 2019).

When issues fall outside of the review of administrative proceedings, such as with BLM's challenge to NEC's standing, fact finding is required as in an original district court proceeding. *Occidental Eng'g Co.*, 753 F.2d at 770; *see also Nw. Motorcycle Ass'n*, 18 F.3d at 1472. In which case, summary judgment is appropriate only when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable fact-finder to return a verdict for the nonmoving party. *Id.*

The moving party bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

9

affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## III.   Discussion

The Court will first address the dispositive issues of standing and mootness before turning to the three remaining watershed arguments.

### A.   Standing

Standing determines whether the plaintiff is the proper party to bring the matter to the court for adjudication. *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). The requirement stems from Article III of the U.S. Constitution, which limits judicial power to resolving actual cases and controversies. U.S. CONST. art. III, § 2, cl. 1.

To establish standing, the party asserting federal subject matter jurisdiction has the burden of proof. *Chandler*, 598 F.3d at 1121-22. At the pleading stage federal courts must accept all material allegations in the complaint as true; at summary judgment mere allegations must be supplanted by specific facts set forth in an affidavit or other evidence. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

10

The U.S. Supreme Court has determined that the "irreducible constitutional minimum of standing" consists of three elements: injury-in-fact, causal connection, and redressability.  *Chandler*, 598 F.3d at 1122 (citing *Defs. of Wildlife*, 504 U.S. at 560-61).  In this case, BLM argues the injury-in-fact requirement is lacking.

In its complaint, NEC alleges that the "aesthetic, recreational, scientific, spiritual, and educational interests of Plaintiffs' members have been and will be adversely affected and irreparably injured if Defendants are permitted to implement the [Watershed] Projects."  (Doc. 1 at ¶ 8).  In support, NEC filed the Standing Declaration of Sara Johnson, who is the executive director of NEC. (Doc. 19 at ¶ 1.)  Johnson avers that she and NEC's members use the areas at issue in this litigation to view, study, and enjoy wildlife species undisturbed in their natural surroundings; to hike, bird-watch, and contemplate in the ecosystem; and do so "frequently and on an ongoing basis in the future."  (*Id.* at ¶¶ 4-5.)  Johnson attests she has been to each of the areas at issue repeatedly, including several field trips to each of the watersheds, during frequent highway travel, and a road trip in 2016 that passed through Blacktail Watershed.  (*Id.* at ¶ 9.)  Johnson further declares that she has "concrete plans to visit each of the watersheds at issue" during the summer of 2020, and she intends to continue to do so on a regular basis to monitor the spread of invasive species and observe wildlife.  (*Id.* at ¶ 10.)  As a wildlife scientist, Johnson states she has observed clear evidence of the decline in

11

wildlife habitats over four decades on public lands managed by the Dillon Field Office.  (*Id.* at ¶ 6.)

BLM argues that NEC lacks standing because Johnson's affidavit fails to provide specifics regarding her visits to the watersheds at issue.  (Doc. 30 at 24-25.)  BLM cites *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009), *Friends of the Earth, Inc. v. Laidlaw Envt'l. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000), and *Cantrell v. City of Long Beach*, 241 F.3d 674, 680 (9th Cir. 2001), for the proposition that allegations of recreational or aesthetic injury require ongoing use of the area and credibly established plans to return to the affected area.  BLM scrutinizes Johnson's affidavit and argues it lacks "details such as the number of trips she has made to each watershed, on what dates, for how long, or for what purposes she visited."  (Doc. 30 at 23-24.)

None of the cases cited by BLM can be construed to require the level of specificity that BLM suggests.  In *Summers v. Earth Island Inst.*, the U.S. Supreme Court said "[w]hile generalized harm to the forest or the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice."  *Summers v. Earth Island Inst.*, 555 U.S. at 494 (citing to *Sierra Club v. Morton*, 405 U.S. 727, 734–736 (1972)).  Applying this standard, the Supreme Court noted that an affidavit of one organization member who alleged repeated visits and imminent plans to return,

12

coupled with interests in viewing the flora and fauna of the area that would be harmed, was sufficient to confer standing. *Id.*

In *Friends of the Earth,* the Court similarly recognized that "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth*, 528 U.S. at 183 (quoting *Sierra Club*, 405 U.S. at 735).

Further, in *Cantrell* the Ninth Circuit found "[a]n environmental plaintiff need not live nearby to establish a concrete injury; '[r]epeated recreational use itself, accompanied by a credible allegation of desired future use, can be sufficient, even if relatively infrequent, to demonstrate that environmental degradation of the area is injurious to that person.'" (Alteration original.) *Cantrell*, 241 F.3d at 680 (quoting *Ecological Rights Foundation v. Pacific Lumber Co.*, 230 F.3d at 1149).

The Court finds that NEC meets its burden to establish standing. Contrary to BLM's assertion, Johnson's repeated field trips to each of the watersheds, and her highway travel and road trips for wildlife viewing and ecological appreciation show concrete and particularized interest in the watershed areas. That Johnson specifically intends on more trips in the upcoming summer of 2020 furthers the point and meets the standard discussed in *Earth Island*: it is not a vague desire to visit, but a specification of when she will do so. (*See* Doc. 19 at ¶ 10.)

13

None of the cases cited by BLM required details such as the number of trips she has made to each watershed, dates, duration, or purpose, as BLM proposes. (Doc. 30 at 23-24.)  Johnson emphasized repeated travel to each of four specific watersheds (Middle Ruby, Centennial, South Tobacco Root, and Blacktail), noting specific areas she has visited within those watersheds: "Red Rocks Refuge … the southern and western boundaries and through Virginia City … along Sweetwater Road,"  as well as imminent plans to return to view wildlife and monitor the spread of invasive species.  (Doc. 19 at ¶¶ 6, 9-10.)  Further, Johnson has a Ph.D in wildlife biology and has shown a particular interest in the Watersheds' health, demonstrating that any environmental degradation of the area is injurious to her.

Taken together, this is precisely the information the U.S. Supreme Court desired in *Earth Island Inst.*, 555 U.S. at 495.  Therefore, the Court finds that NEC meets the standing requirements elucidated in *Sierra Club v. Morton* and its progeny discussed above.

**B.     Mootness of the Centennial Watershed Claim**

The Notice of Final Decision and FONSI for the Centennial Project were signed on November 16, 2015, approving 8,850 acres of prescribed fire in sagebrush habitat.  (Doc. 32 at ¶ 78.)  BLM completed approximately 268 acres of treatments on the Centennial project.  (*Id.* at ¶ 80.)  After the filing of the complaint in this case, however, BLM set aside the remaining portions of the

14

Centennial project which had not been completed for the purpose of completing a new environmental assessment.  (*Id.* at ¶ 81.)

NEC argues that because portions of the Centennial Watershed Decision were implemented before the remainder was withdrawn, NEC is entitled to declaratory relief finding the initial decision was inadequate.  (Doc. 18 at 29-30.) BLM counters that NEC's claims with respect to the Centennial project are now moot and should be dismissed.  (Doc. 30 at 25.)

BLM argues that there is no live controversy for this Court to resolve because "BLM admitted the Centennial Watershed Decision was not consistent with the Dillon RMP in force at the time of the final Decision Notice was issued." (*Id.* at 27.)  BLM further admits that it "set aside portions of the decision in order to conduct additional NEPA analysis," thus withdrawal moots any live controversy.  (*Id.*)  In support, BLM cites to two district court cases, *Native Ecosystems Council v. Weldon*, No. CV 11-99-M-DWM, 2012 WL 5986475, at *3 (D. Mont. Nov. 20, 2012) and *League of Wilderness Defs. - Blue Mountains Biodiversity Project v. Smith*, No. 04-1595 PK, 2006 WL 3692535, at *3 (D. Or. Dec. 12, 2006), for the proposition that "no project means no violations," and withdrawal of a project negates a plaintiff's allegation of actual or threatened injury because there is no injury to redress.  (*Id.*)

15

In response, NEC emphasized that BLM has admitted the substance of NEC's claim and it is ripe for judgment.  (Doc. 34 at 7, 8.)  NEC argues that the withdrawal of the decision only moots the claim as to those portions that have *not* been implemented, but those portions that have been implemented are entitled to a declaration that the decision notice was not in accord with the law and any other relief the Court deems appropriate.  (*Id.* at 8.)

BLM has not carried its burden to show that NEC's claims with respect to the Centennial watershed are moot.  "[A] defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice."  *Friends of the Earth*, 528 U.S. at 189 (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)).  "If it did, the courts would be compelled to leave the defendant free to return to [its] old ways."  *Id.* (quoting *Aladdin's Castle*, 455 U.S. at 289 n.10).  Therefore, a case only becomes moot if "it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."  *Id.* (quoting *United States v. Concentrated Phosphate Export Assn.,* 393 U.S. 199, 203 (1968).  "The 'heavy burden of persuading' the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness."  *Id.*

The Ninth Circuit illustrated this rationale explicitly in the context of NEPA:

When evaluating the issue of mootness in NEPA cases, we have repeatedly emphasized that if the completion of the action challenged

16

> under NEPA is sufficient to render the case nonjusticiable, entities
> 'could merely ignore the requirements of NEPA, build its structures
> before a case gets to court, and then hide behind the mootness doctrine.
> Such a result is not acceptable.'

*Cantrell*, 241 F.3d at 678 (quoting *West v. Secretary of the Department of Transportation*, 206 F.3d 920, 925 (9th Cir. 2000) (internal citation omitted)).  The court in *Cantrell* similarly noted that, in general, the burden of proving mootness is a heavy one, and emphasized that "defendants in NEPA cases face a particularly heavy burden in establishing mootness."  *Id.*  The party asserting mootness is required to establish that there is no effective relief that the court can provide.  *Forest Guardians v. Johanns*, 450 F.3d 455, 461 (9th Cir. 2006).  "The central question of all mootness problems is whether changes in the circumstances that prevailed at the beginning of the litigation have forestalled any occasion for meaningful relief."  *Cantrell*, 241 F.3d at 678 (quoting *West*, 206 F.3d at 925 n.4).  The court in *Cantrell* pointed out that meaningful relief could include requiring additional environmental review or ordering that remedial measures be implemented to address any harm done by the violation.  *Id.*  "As long as effective relief may still be available to counteract the effects of the violation, the controversy remains live and present."  *Id.*

  BLM reliance on *Native Ecosystems Council v. Weldon* and *League of Wilderness Defs. - Blue Mountains Biodiversity Project v. Smith* does not alter this analysis.  Both cases involved the voluntary withdrawal of a project prior to its

implementation.  In *Native Ecosystems Council,* for example, the court noted that "no effective relief for alleged violations [could] be granted because the Project *will not be implemented* and there are, therefore, no *potential* violations." (Emphasis added) *Native Ecosystems Council v. Weldon*, 2012 WL 5986475, at *3. That is not the case here.  BLM acknowledges that the Centennial project had been implemented and partially completed.

BLM has not carried its heavy burden to establish mootness here.  It has not attempted to establish that the challenged conduct cannot reasonably be expected to recur, nor has it addressed whether relief may be available to counteract the effects of the Centennial project which were already implemented.  BLM's motion for summary judgment on this issue should, therefore, be denied.

It does not necessarily follow, however, that NEC's motion for summary judgment as to the Centennial project should be granted.  Neither party provided any substantive briefing on the Centennial project.  While the project has been withdrawn, it is not clear whether the withdrawal is related to any of the violations that NEC alleges in its complaint.  Therefore, the withdrawal of the project does not necessarily establish that any of NEC's claims in this action have merit. NEC's motion for summary judgment should, therefore, be denied as well.

The denial of both parties' motions for summary judgment should be without prejudice.  The parties should be provided an opportunity to refile their

18

motions.  BLM may attempt to meet its burden to establish that NEC's claims with

respect to the Centennial project are moot, and/or that it is entitled to judgment on

NEC's claims as a matter of law.  NEC may attempt to establish that it is entitled

to judgment as a matter of law on its claims relative to the Centennial project.

### C.    Watershed EAs

NEC moves for summary judgment based on BLM's alleged failure "to

provide a 'convincing statement of reasons' why any potential adverse impacts

should be considered insignificant" and justify issuance of FONSIs.  (Doc. 18 at

28-29 (citing 40 C.F.R. § 1508.9(a)(1); *Blue Mountains Biodiversity Project v.*

*Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998) (internal citation omitted)).)

BLM argues that it is entitled to summary judgment because it conducted a

thorough analysis in the watershed EAs and gave a hard look at the effects of the

proposed prescribed mechanical and/or fire treatments on sage grouse and their

habitat, including cumulative effects of each watershed decision.  (Doc. 30 at 30-

31, 37.)

Each watershed EA will be reviewed in turn for whether a hard look was

given.

### 1.    The Middle Ruby River

NEC argues BLM failed to take a hard look at the potential environmental

impact of slashing conifers and burning sagebrush habitat in the Middle Ruby EA.

(Doc 18 at 29.)  The Final Decision and FONSI for the Middle Ruby were signed on December 24, 2014, prior to the adoption of the Sage Grouse Amendment in September 2015.  In effect at the time was Appendix X of the Dillon RMP, entitled Sage Grouse Management.  Appendix X delineated conservation measures to "be considered and used as the basis for conserving sage grouse populations through the implementation of the Dillon RMP."  (RMP at 213.)

Appendix X contains a "Fire Management" section, which addresses the use of prescribed fires and states:

1.    Sites should not be burned unless:

a) biological and physical limitations of the site and impact on sage grouse are identified and considered,
b) management objectives for the site, including those for wildlife, are clearly defined,
c) potential for weed invasion and successional trends are well understood, and
d) capability exists to manage the post-burn site to achieve a healthy sagebrush community.

(*Id.*)

NEC essentially argues that the Middle Ruby EA failed to address these four factors.  Specifically, NEC maintains the EA failed to provide a baseline inventory of sagebrush conditions; failed to provide any information on the biological and physical limitations within the burn area; did not clearly define wildlife objectives considering adverse effects; and failed to develop site-specific recovery objectives.

20

(Doc. 18 at 27.)  BLM disagrees, and points to provisions of the Middle Ruby EA
where it contends these factors were considered.

The Court has reviewed the Middle Ruby EA and finds that BLM
sufficiently addressed all the factors required by Appendix X for prescribed burns.
First, although not specifically required by Appendix X, NEC argues that the best
available science in place at the time of the decision required BLM to conduct a
baseline inventory of sagebrush conditions.  (Doc. 18 at 37.)  To the extent such an
inventory was required, BLM did so.  It addressed the issue in a section entitled
"Upland and Sagebrush Steppe Habitat," and concluded that "[s]agebrush habitat
in the MRRW is in good condition and not a resource issue."  (MRRW at 104.)  It
further specifically found that "[f]ifty one percent of the BLM uplands are
sagebrush and mountain shrub habitat type," and it provided a breakdown of
sagebrush species and subspecies in the watershed which "occupy different niches
based on habitat type, elevation, annual precipitation and soil types."  (*Id.* at 161-
62, 323.)  It also provided a table which breaks down the prevalence of various
vegetation cover types in the project area, including Sagebrush/Mountain Shrubs.
(*Id.* at 324, Table 2) (Sagebrush/Mountain Shrubs is found on 26,084 BLM acres,
consisting of 51% coverage of BLM acreage; 91,638 total acres in the watershed,
consisting of 57% coverage of the total watershed.)  Thus, BLM did conduct a
baseline inventory of sagebrush conditions.

The Court also finds that the Middle Ruby EA sufficiently addressed the first factor in Appendix X for prescribed fire – the biological and physical limitations of the site and consideration of the impact on sage grouse.  Allotments slated for non-commercial mechanical and prescribed fire treatments are identified in the Middle Ruby EA's discussion on alternatives.  (*Id.* at 136-38, 146, 152.) The EA then provides an overview of the watershed followed by allotment-specific descriptions, including those slated for treatments.  (*Id.* at 153-160.)  Further discussion of the watershed's "Upland and Sagebrush Steppe Habitat, Forest and Woodland Habitat," and "Special Species Habitat," as well as resource concerns for noxious and invasive species, among others, provide further discussion on the biological and physical characteristics of the watershed.  (*Id.* at 160-174.)  Lastly, the EA's discussion of environmental consequences revisits these characteristics in context of each alternative, addressing each of the allotments slated for prescribed burning.  (*Id.* at 209-10, 215-16, 217-220, 223-26.)  The Court finds these discussions effectively consider the biological and physical characteristics, including limitations, of proposed burn sites.

The Middle Ruby EA also considers the impact of prescribed burn on sage grouse.  It recognizes that sage grouse is currently a candidate species under the Endangered Species Act, identifies the percentage of BLM land in the Middle Ruby watershed that is within a sage grouse "Priority Management Area" and

within a sage grouse "General Management Area." It also identifies a single sage grouse lek in the watershed and recognizes there are several more within 10 miles of the watershed. (*Id.* at 167-68.). The EA also considered the impact of each alternative on the sage grouse population. (*Id.* at 201, 301).

The EA also satisfies the second requirement of Appendix X that management objectives, including those for wildlife, be clearly defined. The management objectives for the project are defined in the EA in the sections for Riparian, Wetland and Aquatic Habitat; Upland and Sagebrush Steppe Habitat; and Special Status Species Habitat, among others. (*Id.* at 104-05.) Site-specific objectives are also included in Appendix B: Middle Ruby River Watershed Monitoring Plan. (*Id*. at 277-286.) For example, Key Issue #4: Special Status Species Habitat lists as an objective to "[m]aintain >70% mountain big sagebrush habitat in canopy closure of 5 to 25 percent." (*Id.* at 282-283.) BLM has thus satisfied the management objective requirement.

In addition, the potential for weed invasion and successional trends are addressed throughout the EA. For example, it is acknowledged that "[i]n locations where conifer canopy cover is greater than 40%, seeding of native upland and riparian seed mixes may be necessary to achieve desired results and prevent the establishment of noxious and invasive species." (*Id.* at 195.) In the Forest and Woodland Habitat section, it is noted that "[d]isturbances within treatment areas

23

have the potential to facilitate the spread and/or introduction of noxious and invasive species," requiring monitoring and mitigation. (*Id.* at 198.) It is further demonstrated that much of the reasoning and justification for prescribed burning is the inevitable successional trend into adverse habitat conditions without treatment; namely that "conifers are expanding into sagebrush and grassland habitat and that trend is expected to continue." (*Id.* 189.) This sentiment is repeated in multiple sections and contexts.

Further, the discussion under section 4.2.3 Predicted Effects Common to All Action Alternatives, Issue #1: Riparian, Wetland and Aquatic Habitat notes that "[r]iparian juniper removal treatments on fisheries streams would increase the diversity and density of desirable woody and herbaceous species …." Issue #2: Upland and Sagebrush Steppe Habitat states: "Re-introducing natural disturbance regimes i.e., prescribed fire, would result in a mosaic of plant communities and diversity of successional stages in sagebrush habitats." (*Id.* at 196, 197.) Lastly, Issue #4: Special Status Species notes that reducing conifer expansion would restore sagebrush grassland habitat in the long-term, a result of which would be an increase in forb production for sage grouse foraging. (*Id.* at 200-01.) It is clear from these examples, and other allotment-specific and fire treatment discussions, that BLM has demonstrated its understanding and consideration of the potential for weed invasion and of successional trends. (*Id.* at 208-231.)

24

BLM also considered and outlined the final factor – the manner in which the post-burn areas would be managed and monitored – dedicating an entire Appendix to the subject.  (*See* MRRW-Appendix B at 277 *et seq.*)  This includes monitoring of upland and sagebrush steppe habitat and special species habitat.  (*Id.* at 280-84.) BLM also specifically provided for monitoring of sage grouse leks and habitat. (*Id.* at 119.)  Appendix B thus satisfies the fourth requirement and demonstrates that BLM has the capability to manage post-burn sites to achieve a healthy sagebrush community.

NEC also mentions two additional arguments with respect to the Middle Ruby EA.  First, it devotes a single sentence to the argument that the EA "fails to give careful consideration to the potential for cheatgrass invasion," which, NEC asserts, is a "clear violation of BLM's WSA non-impairment standard."  (Doc. 18 at 28.)  As discussed above, BLM clearly articulated its understanding of the potential for weed invasion and of successional trends. (MRRW at 189-193, 195-203, 208-231.)  With respect to cheatgrass, its presence is discussed at many places in the EA, together with a recognition that it needs to be controlled.  (*Id.* at 104, 124, 167, 170, 191.)  It is also noted on multiple occasions that BLM is involved in a cooperative effort with Madison County to control or eradicate noxious weed infestations on public lands.  (*See e.g*. *Id.* at 170.)  Therefore, the Court cannot find that BLM has not considered potential for cheatgrass invasion.

25

With respect to NEC's passing reference to the "non-impairment standard," NEC does not explain the non-impairment standard, where it is found, what it requires, or how BLM's conduct violates it.  Nevertheless, the non-impairment standard is derived from BLM's obligation to manage lands that have been designated as Wilderness Study Areas ("WSA").  Under the Federal Land Policy and Management Act ("FLPMA"), BLM was required to identify lands within its inventory having wilderness characteristics described in the Wilderness Act.  43 U.S.C. § 1782(a).  BLM was to then recommend to the President the suitability of each area to be designated as wilderness, and the President was to advise Congress of the administration's recommendation for a wilderness designation.  43 U.S.C. § 1782(a) & (b).  During the period between BLM's identification of lands having wilderness characteristics, and Congress's final preservation decision, the BLM is required to manage the lands "in a manner so as not to impair the suitability of such areas for preservation as wilderness."  43 U.S.C. § 1782(c).  This is referred to as the "non-impairment standard," and the lands under wilderness consideration are referred to as Wilderness Study Areas.  The BLM currently manages WSAs under "BLM Manual 6330 – Management of BLM Wilderness Study Areas."

Other than to declare it to be so, NEC does not explain how BLM's actions on the Middle Ruby are contrary to the non-impairment standard.  The Middle Ruby does contain portions of two WSAs: 14,217 acres of the Ruby Mountains

26

WSA, and 610 acres of the Axolotl Lake WSA.  (MRRW at 106.)  There are no projects under the Middle Ruby EA which effect the Axolotl WSA.  (*Id.*)

There will be a cleanup and debris removal from an abandon spring development on the Ruby Mountains WSA.  (*Id.*)  BLM acknowledges that there will be short-term negative impacts to the wilderness characteristics of the WSA from the use of vehicles and equipment to dismantle and haul debris from the site. The EA concludes, however, that removal of the debris will return the area to a more natural condition and will improve the long-term wilderness characteristics. (*Id.*)

The Middle Ruby EA also evaluated a prescribed burn in the Garden Creek Allotment, which is within the Ruby Mountains WSA.  (*Id.* at 220.)  Again, BLM acknowledges that the action would have short-term negative impacts to the wilderness character, primarily while the work is being performed.  (*Id.*)  But the BLM determined the long-term effect would be the return to a natural condition. (*Id.*)  The EA also recognizes that prescribed fire may be used in WSAs under BLM Manual 6330, "where the natural role of fire cannot be returned solely by reliance on wildfire."  (*Id.*)  The BLM concluded that "without the proposed treatments natural change wouldn't occur."  (*Id.*)

As this Court has previously recognized, "BLM specifically contemplated using prescribed fire in its Management of WSAs Manual as a tool to make

conditions possible for natural fire to return to the WSAs." *Tillet v. BLM,* 2015 WL 5098438 *7 (D. Mont. August 18, 2015).  As in *Tillet*, the Court finds that "BLM took the requisite hard look at the effects of the prescribed burns on the WSAs and wilderness characteristics in the area." *Id.*

NEC next argues that the Middle Ruby EA "failed to 'consider site specific methods and procedures' for conserving sage grouse and their habitat, as required of BLM for sensitive species." (Doc. 18 at 28.)  BLM responds that site specific monitoring, special status species, and objectives for improving habitat are discussed in the EA; and site-specific objectives are clearly defined in the Monitoring Plan found in Appendix B. (Doc. 30 at 41 (citing MRRW at 280-285, 277-288, respectively).)  A review of Appendix B shows objectives for upland and sagebrush steppe habitat, monitoring activities to measure progress towards upland habitat and associated species objectives, and site-specific Upland and Sagebrush Habitat Monitoring under Table B-2. (MRRW at 280-281.)  Appendix B also states the objectives and monitoring activities pre- and post-implementation for Forest and Woodland Habitat, and objectives and monitoring activities for Special Status Species Habitat, which includes a site-specific table. (*Id.* at 282-284.)  The objectives and monitoring activities for Noxious and Invasive Species, Wilderness, Recreation and Travel Management, Socioeconomics, Wildland Urban Interface, and Cultural and Paleontological Resources are also discussed. (*Id.* at 284-285.)

28

The Court finds BLM's citations support its argument that site-specific monitoring, special status species, and objectives for improving habitat were adequately addressed.

Therefore, having reviewed the parties' arguments and the Middle Ruby administrative record, the Court finds that BLM took the necessary hard look at the environmental impacts of the agency's proposed action in the Middle Ruby River Watershed.

### 2.    The South Tobacco Root

NEC next argues that the Tobacco Root's Final Decision and FONSI relied upon a flawed EA to approve 8,000 acres of mechanical and prescribed burn treatments.  (Doc. 18 at 30.)   NEC asserts that the Tobacco Root EA fails to comply with the Sage Grouse Amendment; hence the approval of prescribed burning treatments violates NEPA's requirement to take a hard look.  (*Id.*)

BLM issued the Tobacco Root EA more than two years after the Sage Grouse Amendment to Dillon's RMP.  (*Cf.* STRW at 2, 163.)  The Amendment incorporated appropriate greater sage grouse conservation measures, including provisions for prescribed burning.  Management Decision 31 ("MD 31") sets forth the Amendment's requisite analysis for prescribed burning.  (SGRMP at 48.)  MD 31 states:

> If prescribed fire is used in GRSG habitat, the NEPA analysis for the Burn Plan will address:

29

- why alternative techniques were not selected as a viable options;

- how GRSG goals and objectives will be met by its use;

- how the COT Report objectives will be addressed and met;

- a risk assessment to address how potential threats to GRSG habitat will be minimized.

Allow prescribed fire as a vegetation or fuels treatment in Wyoming big sagebrush sites or other xeric sagebrush species sites, or in areas with a potential for post-fire exotic annual dominance only after the NEPA analysis for the Burn Plan has addressed the four bullets outlined above. Prescribed fire can be used to meet specific fuels objectives that will protect Greater Sage-Grouse habitat in PHMA (e.g., creation of fuel breaks that will disrupt the fuel continuity across the landscape in stands where annual invasive grasses are a minor component in the understory, burning slash piles from conifer reduction treatments, used as a component with other treatment methods to combat annual grasses and restore native plant communities).

Allow prescribed fire in known sage-grouse winter range only after the NEPA analysis for the Burn Plan has addressed the four bullets outlined above. Any prescribed fire in winter habitat will need to be designed to strategically reduce wildfire risk around and/or in the winter range and designed to protect winter range habitat quality.

(*Id.*)

BLM first argues that the MD 31 requirements only apply to treatments "in Wyoming big sagebrush sites or other xeric sagebrush species sites," which excludes the Tobacco Root's planned burns because they are in a "cryic zone."

30

(Doc. 30 at 33.)  This argument is unconvincing.  MD 31's initial directive plainly applies "if a prescribed fire is used in [sage grouse] habitat."  (SGRMP at 48.)  If so, the NEPA analysis must address the four factors set forth.  According to the South Tobacco Root EA, the underlying reasoning for the burns is to "meet the goals and objectives of GRSG by reducing the loss of *existing* greater sage grouse habitat."  (STRW at 296) (emphasis added.)  Clearly, the burns are in greater sage grouse habitat.

Second, BLM argues in its reply brief that the "Watershed Decisions Records challenged here … are not burn plans," thus they do not need to meet MD 31's requirements in the EA itself but will be incorporated into future burn plans once they are developed.  (Doc. 38 at 15.)  This argument ignores the clear directive in MD 31 that the "NEPA analysis" must address these factors.  The NEPA analysis is conducted prior to the issuance of a final decision, not in the implementation stage.  The Ninth Circuit has made clear that the NEPA "analyses must occur before the proposed action is approved, not afterward."  *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1083 (9th Cir. 2011).  In *Northern Plains*, a railroad company proposed to build a 130-mile railroad line in Southeastern Montana and the plaintiff challenged the project on the grounds that the impact on sensitive wildlife and plants had not been properly evaluated during the NEPA process.  *Id.*  The final EIS proposed that surveys of sensitive plants and

31

wildlife would be conducted after approval of the project, and mitigation efforts would be implemented to minimize the impact. *Id.* at 1083-84. The Ninth Circuit held that deferring the gathering of such baseline data until after the NEPA approval process was improper. *Id.* at 1084. "[O]nce a project begins, the pre-project environment becomes a thing of the past and evaluation of the project's effect becomes simply impossible." *Id.* at 1083 (internal quotations omitted; alteration original) (quoting *LaFlamme v. F.E.R.C.*, 852 F.2d 389, 400 (9th Cir. 1988)). Thus, BLM's argument that the NEPA analysis for the burn plan is forthcoming is unavailing.

Even so, the Tobacco Root EA addresses MD 31's factors specifically in bullet point format, with references to further discussions in the Upland and Sagebrush Steppe Habitat section. The Court finds that BLM satisfies the first factor by addressing why alternative techniques were not selected. (STRW at 295.) BLM explains that "it has been found that alternative techniques such as piling slash, or lop-scatter without broadcast burning[,] does not meet objectives of reducing conifer expansion into sage steppe habitat." (*Id.*) Further discussion in Chapter 4, Resource Concern #1: Special Status Species Habitat is highly relevant to the decision to employ prescribed burns in tandem with mechanical treatments, with scientific references in support. (*Id.* at 297-303.) Chapter 3, Section 3.2.4 Issue #4: Upland and Sagebrush Steppe Habitat also discusses vegetative coverage

32

and conifer expansion, as well as the history of vegetative treatments, and uses

Figure 23.4 to illustrate "[y]oung conifers re-establishing following mechanical

treatment." (*Id.* at 245-249.) The accompanying discussion explains, "[d]uring the

2016 field assessment, the IDT noted conifer seedlings have reestablished in most

of the area that was not treated with follow-up broadcast prescribed fire." (*Id.* at

249.) Such explicit discussion on the effectiveness of mechanical treatments alone

versus mechanical treatments and prescribed fire in tandem convince the Court that

this factor is satisfied.

Second, the Court finds BLM adequately addressed how sage grouse goals

and objectives will be met using prescribed burning, stating that proposed

treatments will reduce "loss of existing habitat through conifer expansion and

enhancing early seral sagebrush habitat to match expected potential for the

ecological site." (*Id.* at 296.) In addition, the treatments will help create the

potential for lower wildfire severity and intensity by reducing fuel loads in sage

grouse habitat. (*Id.*) The subsequent Special Status Species section then discusses

prescribed fire treatments, impacts to various species of plants, animals (including

sage grouse), and types of habitat, as well as Sage Grouse Amendment objectives.

(*Id.* at 297-303.) Thus, the second factor has been sufficiently addressed.

The third factor is likewise satisfied in that the COT Report objective to

"[r]etain and restore healthy native sagebrush plant communities with the range of

sage grouse" is aligned with the Tobacco Root EA's objectives.  (*Id.* at 148, 296.)
As BLM notes, the EA's "purpose and need contained in chapter 1.2 echoes the
COT Report Objective."  (*Id.* at 296.)  A review of that chapter and section show
that the purpose of the EA is to improve land health and enhance biodiversity by,
among other things, "[m]aintaining, and/or enhancing upland health including
sagebrush steppe habitat (species composition and structure) through … vegetation
treatments." (*Id.* at 148.)  Considering the detailed discussions mentioned above
that address prescribed fire's usefulness to improving Upland and Sagebrush
Steppe Habitat, the Court is satisfied this third factor is met.

Lastly, the Court finds that the South Tobacco Root EA also addresses the
fourth factor: a risk assessment to address how potential threats to sage grouse
habitat will be minimized.  The Special Species Habitat section effectively
illustrates that potential threats to greater sage grouse habitat have been assessed
and considered, stating that the timing of prescribed fire treatments "would
minimize conflicts with wildlife," that "[s]urveying for special status species prior
to treatments would reduce impacts," and that if left untreated conifer expansion
would eliminate sagebrush obligate species' habitat.  (*Id.* at 298.)  The section also
references Appendix C, the Blacktail Watershed Biological Evaluation for Special
Status Fish and Wildlife Species.  (*See Id.* at 317; 331-333.)  The discussion there
further illustrates BLM's consideration of the effect of conifer expansion on

34

habitat, as well as the effects (positive and negative) of prescribed burning on sage grouse and habitat. (*Id.* at 331-333.)

NEC also asserts several additional arguments outside of MD 31 directives: that the Tobacco Root EA fails to disclose locations and/or extent of the conifer encroachments that the prescribed burns intend to treat; that the actual threat of uncontrolled wildfire is not assessed; that the location of sage grouse winter habitat is not disclosed, and therefore fails to analyze the potential impacts from prescribed burns on the ability of winter habitat to meet RMP objectives; and that cumulative impacts from prescribed burns were not considered. (Doc. 18 at 30-33.)

In response, BLM asserts the Tobacco Root administrative record shows precisely where conifer treatments will be conducted, citing to STRW-395, and the extent of conifer encroachment, citing to STRW-23-36. (Doc. 30 at 41.) A review of those sections shows in the first instance Map-3 Fuel Treatment Units, in which Alternatives B and C prescribed burns are identified in green, and Alternative C in blue. (STRW at 395.) The second citation directs to the South Tobacco Root Final Decision under the heading Non-Commercial Mechanical/Prescribe Fire Treatments, which announces that Alternative C was chosen. (*Id.* at 23.) Thus, the blue demarcations in Map-3 identify specific locations of treatments. Further discussion of treatment units, acreage, objectives, treatment types, and affected

allotments are discussed and listed.  (*Id.* at 23-36 & Table 16.)  Map-1 also shows

allotments and general sage grouse habitat.  (*Id.* at 393-394.)  Thus, Maps 1 and 3,

in concert with Table 16, effectively disclose the locations of proposed prescribed

burns and sage grouse general habitat management areas.

BLM also points to additional discussions (STRW - 251-53, 430-32, 486-88)

on the extent of conifer expansion in the EA.  (Doc. 30 at 41-42.)  In reviewing

these sections, the Court is satisfied that BLM has taken a hard look at conifer

expansion, and notes the EA's conclusion that "[t]he only allotments in the STRW

that do not have extensive conifer expansion are the Dry Lakes, Virginia City Hill,

and Madison Overlook allotments."  (*Id.* at 251-52.)  Each of the citations BLM

proffers and others that the Court has noted discuss conifer expansion to varying

degrees.  (*Id.* at 251-253; *see e.g.* 299-302; 326-27; 329; 430-32.)  Thus, the Court

finds BLM has given a hard look to conifer expansion.

Second, NEC does not show or cite to any requirement for BLM to assess

"the actual threat of uncontrolled wildfire."  (*See* Doc. 31-32.)  A review of the

scope of the Tobacco Root EA does not explicitly include wildfire as a topic of

assessment.  (STRW at 159-160.)  Nevertheless, BLM addresses NEC's argument

and points out that wildfire was discussed in the context of noxious and invasive

species.  (Doc. 38 at 14 (citing STRW-296-97).)  The introductory paragraph to

that discussion effectively frames the risks of proposed forest health/fuels

treatments in contrast to research that "indicates the increase in non-native species is much greater with a high severity wildfire."  (STRW at 296-97.)  Further review of the record shows multiple references to wildfire in passing and specific discussion in Section 3.2.2 Issue #2: Wildland Urban Interface (WUI).  (*Id.* at 237.)  In that section, Figure 3.1, Priority WUI and Potential WUI Areas, Madison County, Montana, illustrates the Tobacco Root watershed as being a high priority/potential area for wildland urban interface:

> Continuous fuels surrounding private structures and limited access put these properties at an elevated risk of being threatened by wildfire. The occurrence of a large wildfire between the irrigated agricultural lands of the valley bottoms and the higher-elevation, unpopulated public lands (BLM and USFS) will require a major suppression effort.

(*Id.* at 238-39.)  In Section 3.2.4 Issue #4: Upland and Sagebrush Steppe Habitat, further discussion is given to wildfire in the context of woodland succession phases, as "easily correlated to departure discussed in the context of fire regime condition classes (see South Tobacco Root Watershed Assessment Report p. 64-68), and associated exclusion of wildfire on the landscape with resulting higher fuel loads …"  (*Id.* at 247.)  A lengthy discussion on Fire Ecology and Fire Regimes of the Tobacco Root watershed describes "the fire frequency, behavior, ecological effects, seasonality, pattern and type for a given ecosystem or vegetation type," as well as management recommendations.  (*Id.* at 509-514.)  Each of the ecosystem/vegetation types discussed include a "current conditions" paragraph.

(*Id.* at 511-513.)  In Section 4.2.2 Predicted Effects of Alternative A, Issue #1: Forest and Woodland Habitat, notes the effects of wildfire in beetle-killed trees is currently being researched.  (*Id.* at 275.)  The section also notes that wildfire management will continue as defined in the Dillon RMP and Dillon Fire Management Plan.  (*Id.* at 276.)  Lastly, Section 4.3.3 Cumulative Effects of All Alternatives, Including No Action addresses wildfire, notes that fire severity has increased during past decades due to fuel loading from altered fire return intervals, "with the exception of the treated areas."  (*Id.* at 362.)  This section adequately addresses the threat level of continued trends without a return of fire to the landscape.  (*Id.*)

The Court finds that while NEC has failed to show where BLM is required to disclose "the actual threat of uncontrolled wildfire," BLM has clearly integrated wildfire discussions throughout the Tobacco Root EA.

Third, the Court finds that BLM has addressed sage grouse breeding and winter habitat.  BLM convincingly shows that a majority of sage grouse habitat in the watershed has conifer encroachment and is no longer suitable sage grouse habitat, therefore no breeding or winter habitat is being treated.  (*Id.* at 252-253, 430-32, and 486-488.)  In section 3.2.4 Resource Concern #1: Special Status Species Habitat, for example, BLM notes that the Habitat Assessment Framework provides guidance for sage grouse habitat management and when applied to data

for the Tobacco Root Watershed, the BLM found that the majority of the Tobacco Root's sage grouse general habitat management area is no longer suitable sage grouse habitat. (*Id.* at 251-253.) Appendix C: Biological Evaluation, BLM propounds the point: "A majority of the sage grouse GHMA has extensive juniper and Douglas-fir expansion, resulting in it no longer being suitable sage grouse habitat." (*Id.* at 431.) Thus, the Court finds the Tobacco Root EA credibly addresses NEC's criticism, and adequately explains why conifer encroachment has made the habitat unsuitable for breeding or winter habitat, hence none exists, and why the Tobacco Root watershed is characterized only as a general habitat management area.

Lastly, NEC argues that BLM failed to consider cumulative impacts from prescribed burns. (Doc. 18 at 32.) NEC's argument is confined to a single sentence with no further discussion. (*Id.*) The Tobacco Root EA has a section which specifically covers the cumulative effects for all alternatives. (*See* STRW at 356-368.) NEC does not explain why this discussion is deficient and fails to take a hard look at the cumulative effects of the proposed action.

Having considered NEC and BLM's arguments, as well as the Tobacco Root administrative record, the Court finds that BLM took the requisite hard look at the environmental impact of the proposed action on the South Tobacco Root Watershed.

39

### 3.    Blacktail Watershed

NEC argues that the Blacktail EA's approval of 8,180 acres of mechanical treatments and prescribed burning fails to take a hard look in multiple ways, devoting a single sentence to each argument.  (Doc. 18 at 33-35.)  First, NEC appears to raise several arguments related to BLM's non-impairment standard for WSAs.  NEC alleges that "[e]ven for burning sagebrush habitat in the WSAs, the Blacktail EA fails to disclose the potential direct, indirect and cumulative impacts of such aggressive treatment on the wildlife …."  (*Id.* at 34.)  Second, NEC argues that BLM approved treatments in the WSAs "without providing 'clearly articulated, well supported management objectives and scientific information,' as required to demonstrate compliance with the non-impairment standard …."  (*Id.*)  Third, NEC asserts that the Blacktail EA "failed to take a hard look at the potential impacts of exotic/invasive species associated with such WSA vegetation treatments," or consider other wilderness characteristics.  (*Id.*)

NEC's contentions relative to WSAs and the non-impairment standard are devoid of any explanation or support from the record or legal authority.  Nevertheless, there are two WSAs within the Blacktail watershed: 14,632 acres of the Blacktail Mountains WSA, and 6,330 acres of the East Fork Blacktail Creek WSA.  (BTW at 115.)  The Blacktail EA recognizes their existence within the watershed, and specifically provides that the areas will be managed in accordance

40

with the non-impairment standard outlined in the BLM Manual 6330 for

Wilderness Study Areas.  (*Id.*)  The EA also specifies that the two WSAs will be

managed as "Visual Resource Management Class I," under which "the landscape is

the primary management goal."  (*Id.* at 183.)  According to the EA, lands managed

under this classification are only subject to limited management activity, where the

"level of change to the characteristic landscape should be very low and must not

attract attention."  (*Id.*)

The impact of the proposed project on the wilderness characteristics of the

WSAs was also discussed.  (*Id.* at 227-28, 245.)  The BLM concluded that conifer

expansion treatments in both WSAs would have minor short-term negative impacts

to the wilderness characteristics while the proposed projects are in progress.  (*Id.* at

228, 245.)  But the long-term impact on the WSAs would be positive, returning the

area to a more natural condition.  (*Id.*)  The mechanical treatments and prescribed

burns would also be conducted in a fashion to mitigate the visual/human impacts

on the project.  (*Id.* at 226-27, 245.)  Trees would be cut low to the ground and

mechanical treatments would be followed by prescribed burning as soon as

possible.  (*Id.* at 228.)

The Court thus finds that the Blacktail EA specifies the manner in which the

WSAs in the project area will be managed to preserve their wilderness

characteristics and considered the impact of the proposed treatments on those
wilderness characteristics.

NEC's unsupported contentions to the contrary are unavailing.  As to its first
contention, the Court finds that the BLM sufficiently discloses the direct and
indirect impacts of prescribed burning on wildlife in the watershed in Appendix C.
(*Id.* at 317-342.)  The EA's "Narrative of Potential Impacts" explicitly addresses
wildlife in the watershed by species and the impact, if any, of prescribed burning
on relevant species.  (*Id.* at 323-337.)  The narrative also includes scientific
citations in text, as well as in literature cited at the end of the section.  (*See Id.* at
339-342.)  BLM sufficiently discloses impacts of prescribed burning on wildlife in
the current plan.

As to NEC's second contention, NEC provides no support or authority for
the standard it alleges BLM failed to meet; i.e., "clearly articulated, well supported
management objectives and scientific information," that are "required to
demonstrate compliance with the non-impairment standard."  (Doc.  18 at 34.)
Nevertheless, the Court finds that the Blacktail EA provides well supported
management objectives.  (BTW at 111-116, 151, 157-158.)  BLM also explains
why the treatments are necessary (BTW at 129, 151, 153-155, 157-158, 191, 197-
199, 200-202), and provides for an appropriate monitoring program (BTW at
Appendix B: 303-315).

42

NEC's final assertion appears to be a broad contention that the wilderness characteristics of the area were not considered.  As discussed above, however, the Blacktail EA provides for the management of the WSAs in the watershed in accordance with established BLM policy, and considers the impact of the project on their wilderness characteristics.

NEC also includes several additional abbreviated arguments.  NEC contends, for example, that the Blacktail EA fails to disclose and analyze the amount and location of seasonal sage grouse habitat; the location of breeding and winter sage grouse habitat; and the potential impacts of prescribed fire on habitat objectives for sage grouse in the RMP.  (Doc 18 at 34-35.)  But to the contrary, the EA explains that sagebrush habitat is crucial for sage grouse and identifies the percentage of the watershed that consists of sagebrush-steppe habitat (55%). (BTW at 177.)  The assessment discusses the location of five known leks within the watershed and identifies two leks on BLM lands.  (*Id.*)  The effect of conifer expansion on grouse habitat, and the effects (positive and negative) of prescribed burning on sage grouse and their habitat are also discussed extensively.  (*Id.* at 331-333.)

NEC next argues that the Blacktail EA fails to consider the cumulative effects of past, proposed, and future burning, both wildfire and prescribed, on sagebrush habitats.  (Doc. 18 at 35.)  In reviewing the record, the Court finds that

the Blacktail EA includes an extensive section on cumulative effects of all the proposed alternatives.  (BTW at 245-257.)  The watershed assessment also includes a passage on fire history.  (BTW-370-71.)  The EA identifies two noxious weeds/invasive species as major concerns, which *exclude* cheatgrass as a major concern, though discussion acknowledges its presence in the watershed.  (*Id.* at 181; *see also* 405-06.)  Lastly, the assessment includes extensive discussion on Fire Ecology and Fire Regimes, which include classifications and discussions of sagebrush and sage grouse habitat, summaries on particular areas, special status species and noxious weeds, and recommendations.  (*Id.* at 412-422.)

NEC alleges next that while BLM asserts conifer encroachment into sagebrush and grassland habitats is extensive, no baseline data is provided, no habitat objectives are disclosed, no discussion of relative benefits of the various habitats to wildlife is analyzed, and no forage values associated with ecotones in their undisturbed state are discussed. (Doc. 18 at 35.)   NEC cites to its own Notice of Appeal before the Interior Board of Land of Appeals for this proposition (BTW-611-613, 632-633.)  (*Id.*)

BLM asserts in response that the Blacktail EA includes baseline data, citing to Appendix C-Blacktail Watershed Biological Evaluation for Special Status Fish and Wildlife Species, and discusses the benefits of the treatments to habitat, citing to BTW-153, 170-76.  (Doc. 30 at 42.)  A review of these citations shows in-depth

44

discussion of baseline conditions for sagebrush and grassland habitats, wildlife by species, and conifer encroachment.  The Court further notes that the Objectives of Non-Commercial Mechanical/Prescribed Fire Units are described in Table 3 of the Final Decision and following pages.  (BTW at 8-22.)

Therefore, after considering the arguments of NEC and BLM and reviewing the administrative record, the Court finds that BLM took a hard look at the environmental impact of the proposed action on the Blacktail Watershed.

## IV.    Conclusion

In summary, the Court finds that NEC has standing to bring this action.  The Court also finds that BLM has not sustained its burden to establish that NEC's claims with respect to the Centennial EA are moot.  Therefore, BLM's motion for summary judgment with respect to those issues should be denied.

After careful consideration to the parties' arguments and the administrative record, the Court finds that BLM has taken the necessary hard look at the environmental impact of the agency's proposed action on the Middle Ruby River, South Tobacco Root, and Blacktail Watersheds.  BLM's motion for summary judgment with respect to those issues should be granted.

Based on the foregoing, **IT IS RECOMMENDED** that:

1.    BLM's motion for summary judgment based on NEC's standing to bring this action be **DENIED**;

45

2.      The parties' cross-motions for summary judgment with respect to the Centennial Watershed be **DENIED**, without prejudice;

3.      NEC's motion for summary judgment with respect to the Middle Ruby River, South Tobacco Root, and Blacktail Watersheds be **DENIED**;

4.      BLM's cross-motion motion for summary judgment with respect to the Middle Ruby River, South Tobacco Root, and Blacktail Watersheds be **GRANTED**.

**NOW, THEREFORE, IT IS ORDERED** that the Clerk shall serve a copy of the Findings and Recommendation of United States Magistrate Judge upon the parties.  The parties are advised that, pursuant to 28 U.S.C. § 636, any objections to the findings and recommendations must be filed with the Clerk of Court, and copies served on opposing counsel, within fourteen (14) days after entry hereof, or objection is waived.

**IT IS ORDERED**.

DATED this 11th day of February, 2020.

_____

TIMOTHY J. CAVAN
United States Magistrate Judge