# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# BILLINGS DIVISION

| | |
|---|---|
| **NATIVE ECOSYSTEMS COUNCIL,** | **CV 18-157-BLG-SPW** |
| **Plaintiff,** | |
| **vs.** | **ORDER** |
| **JOHN J. MEHLHOFF, State Director,[1] the BUREAU OF LAND MANAGEMENT, DEPARTMENT OF THE INTERIOR; et al.,** | |
| **Defendants.** | |

Before the Court are Magistrate Judge Cavan's Findings and Recommendations, (Doc. 39), regarding the parties' cross-motions for summary judgment. Native Ecosystems Council ("NEC") has filed objections, (Doc. 40), and the Bureau of Land Management ("BLM") has filed a response, (Doc. 42). For the following reasons, the Court adopts Judge Cavan's Findings and Recommendations in part.

---

[1] Substituted by operation of Rule 25(d) of the Federal Rules of Civil Procedure for the former Acting State Director, Donato Judice.

## I.   Background

The parties do not object to Judge Cavan's findings with respect to the background of this case, (Doc. 39 at 1–5), and the Court adopts them in full.

After assessing four watersheds in southwestern Montana as part of its 2006 Resource Management Plan, BLM determined that, without intervention, conifer encroachment would convert each watershed's sagebrush steppe habitat into forest habitat. (*Id.* at 2.)  BLM prepared Environmental Assessments for each watershed and proposed mitigating the conifer expansion through a combination of prescribed fire and mechanical treatments. (*Id.*)  Following a comment period, BLM issued a Notice of Final Decision along with a Finding of No Significant Impact for each watershed, approving the prescribed fire and mechanical treatments. (*Id.* at 2–3.)

While this process was ongoing, however, BLM amended its Resource Management Plan to address the "present or threatened destruction" of sage grouse habitat and range (the "Sage Grouse Amendment"). (*Id.* at 3; Doc. 13-20 [hereinafter *SGRMP*] at 11.)  The BLM issued the Sage Grouse Amendment in response to the United States Fish and Wildlife Service's finding that the greater sage grouse was "warranted, but precluded," for listing as a threatened or endangered species. (SGRMP at 11.)  Among other changes, the Sage Grouse Amendment required BLM to consider additional criteria before using prescribed burns in greater

2

sage grouse habitat.   (SGRMP at 48.)

NEC brought this action to prevent BLM from completing the prescribed burns in the four watersheds.   NEC argues that the watershed projects ignore the Sage Grouse Amendment's requirements for prescribed burns and BLM's authorization of the prescribed burns was arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the law.   (Doc. 39 at 4); *see* (Doc. 1 at ¶ 2; Doc. 18 at 12–13, 16–20).

The parties filed cross-motions for summary judgment.   (Doc. 16; Doc. 28.) Judge Cavan disagreed with NEC and recommended the Court grant summary judgment in BLM's favor with respect to three of the four watersheds.   Regarding the fourth, the Centennial Watershed, Judge Cavan recommended denying both cross-motions to allow for additional briefing.   (Doc. 39 at 45–46.)

## II.   Legal Standard

When a party timely objects to any portion of the Findings and Recommendations, the Court must review those portions of the Findings and Recommendations de novo.   28 U.S.C. § 636(b)(1); *McDonnell Douglas Corp. v. Commodore Business Machines*, 656 F.2d 1309, 1313 (9th Cir. 1981).   "A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.   The judge may also receive

3

further evidence or recommit the matter to the magistrate judge with instructions."

28 U.S.C. § 636(b)(1).   The Court needs not review the factual and legal

conclusions to which the parties do not object.   *United States v. Reyna-Tapia*, 328

F.3d 1114, 1121 (9th Cir. 2003).

NEC first objects to the standard of review Judge Cavan applied in his

Findings and Recommendations.   NEC argues that while the Findings and

Recommendations analyze BLM's watershed projects under the National

Environmental Policy Act ("NEPA"), the thrust of its argument actually concerns

violations of the Federal Land Policy and Management Act ("FLPMA").   (Doc. 40

at 2.)

Courts review NEPA under the Administrative Procedure Act ("APA") by

determining whether an agency action is "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with the law."   5 U.S.C. § 706(2)(A); *see*

(Doc. 39 at 5–8 (discussing the highly deferential standard for NEPA decisions

under the APA)).   Judicial review under the APA of a NEPA action is narrow and

limited to whether the agency "took a 'hard look' at the environmental impacts of a

proposed action."   *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606

F.3d 1058, 1072 (9th Cir. 2010).   On the other hand, courts review BLM's actions

under FLPMA to determine whether they are consistent with applicable Resource

4

Management Plans.   43 U.S.C. § 1732(a); *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 69 (2004).   FLPMA's standard is therefore less deferential. Actions that the Court determines are inconsistent with a Resource Management Plan are "not in accordance with the law," 5 U.S.C. § 706(2)(A), even if the Court finds the agency otherwise took a hard look at the environmental impacts of the proposed actions under NEPA.

BLM argues that NEC raised its arguments under FLPMA for the first time in its objections.   However, the Court finds that while NEC rarely referred back to and analyzed FLPMA in its original briefing, it *did* successfully raise arguments under FLPMA each time it argued one of BLM's proposed watershed projects was inconsistent with BLM's Resource Management Plan (both before and after the Sage Grouse Amendment).   *See* (Doc. 16 at 23–31.)

Nevertheless, while the Findings and Recommendations do "sound almost exclusively in NEPA," (Doc. 40 at 2), this is because Management Decision Fire 31[2]

---

[2] Management Decision Fire 31 states the following:
   If prescribed fire is used in GRSG habitat, the NEPA analysis for the Burn Plan will address:
   • why alternative techniques were not selected as viable options;
   • how GRSG goals and objectives will be met by its use;
   • how the COT Report objectives will be addressed and met;
   • a risk assessment to address how potential threats to GRSG habitat will be minimized.
   Allow prescribed fire as a vegetation or fuels treatment in Wyoming big sagebrush sites or other xeric sagebrush species sites, or in areas with a potential

—NEC's primary point of contention between the Resource Management Plan, the Sage Grouse Amendment, and the proposed watershed projects—adds new requirements for a *NEPA analysis* whenever "prescribed fire is used in a [greater sage grouse] habitat." (SGRMP at 48.)   Therefore, NEC's FLPMA and NEPA claims substantially overlap.   First, to comply with FLPMA, BLM must have completed the NEPA analysis according to Management Decision Fire 31's requirements in the first instance.   BLM complied with FLPMA if, in its NEPA analysis for each proposed burn plan, BLM addressed prescribed burning and "why alternative techniques were not selected as viable options; how [greater sage grouse] goals and objectives will be met by its use; how the COT Report objectives will be addressed and met;" and included "a risk assessment to address how potential threats to GRSG habitat will be minimized."   Second, whether the NEPA analysis itself

---

for post-fire exotic annual dominance only after the NEPA analysis for the Burn Plan has addressed the four bullets outlined above. Prescribed fire can be used to meet specific fuels objectives that will protect Greater Sage-Grouse habitat in PHMA (e.g., creation of fuel breaks that will disrupt the fuel continuity across the landscape in stands where annual invasive grasses are a minor component in the understory, burning slash piles from conifer reduction treatments, used as a component with other treatment methods to combat annual grasses and restore native plant communities).

Allow prescribed fire in known sage-grouse winter range only after the NEPA analysis for the Burn Plan has addressed the four bullets outlined above. Any prescribed fire in winter habitat will need to be designed to strategically reduce wildfire risk around and/or in the winter range and designed to protect winter range habitat quality.

(SGRMP at 48.)

was adequate depends on whether BLM took a hard look at each of the items included in Management Decision Fire 31. If BLM did, then it has met the requirements under both FLPMA and NEPA.

## III.   Discussion

As an initial matter, the Court notes that BLM has not objected to Judge Cavan's conclusion that NEC has standing to bring this action, (Doc. 39 at 10–14), and that NEC's claims about the Centennial Watershed project are not moot, (Doc. 39 at 15–18). The Court agrees with Judge Cavan's analyses and conclusions regarding these issues and adopts them in full.

The Court turns now to NEC's objections to Judge Cavan's analysis of each watershed project. While the Findings and Recommendations refer almost exclusively to NEPA, for the most part, they are organized in a way that addressed the NEPA analysis requirements that Management Decision Fire 31 imposes. Therefore, the Findings and Recommendations essentially addressed and analyzed NEC's claims under FLPMA. The Court reviews the Findings and Recommendations from this point of view, filling in additional analysis as needed.

*A. Timing of the Burn Plan Preparation*

NEC argues that "in the case of the Blacktail and South Tobacco Root Projects, BLM has deferred preparation of these required burn plans to the project

7

implementation stage . . . ."   (Doc. 40 at 11.)   NEC argues that since the burn plans do not yet exist, BLM could not have conducted a NEPA analysis for them pursuant to Management Decision Fire 31, and therefore, BLM has committed a *per se* violation of FLPMA.   (*Id.*)

Management Decision Fire 31 requires the NEPA analysis *for* the Burn Plans—not *of* the Burn Plans—to satisfy additional requirements.   *See* (SGRMP at 48.)   In other words, BLM does not need the burn plans in hand before conducting a NEPA analysis for the proposed treatments in each watershed's Environmental Assessment; instead, "The NEPA analysis is conducted prior to the issuance of a final decision, not in the implementation stage.   The Ninth Circuit has made clear that the NEPA 'analyses must occur before the proposed action is approved, not afterward.'"   *See* (Doc. 39 at 31 (quoting *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1083 (9th Cir. 2011))).

The NEPA analysis evaluates proposed treatments in each watershed's Environmental Assessment while the Burn Plan executes those proposed treatments at the project-implementation stage.   *See* (STRW at 178) ("A burn plan would be prepared and approved prior to implementing prescribed fire treatments.").   As BLM previously stated, "[t]he NEPA analysis from the Watersheds' [Environmental Assessments], as well as design features and mitigation measures, will be

8

incorporated into future burn plans once developed." (Doc. 38 at 12.) Accordingly, there is no *per se* violation of FLPMA if BLM completed the required NEPA analysis for each factor in Management Decision Fire 31 before using prescribed fire in each watershed.

### B. FLPMA

#### 1. Middle Ruby River Watershed

NEC does not object to whether the Middle Ruby River Watershed Environmental Assessment and Final Decision violate FLPMA. The Middle Ruby River Watershed's Final Decision and Finding of No Significant Impact were issued in December 2014, (Doc. 13-11 [hereinafter *MRRW*] at 2), before the Sage Grouse Amendment, (SGRMP at 1). The Middle Ruby River Watershed's Environmental Assessment and Final Decision therefore did not need to comply with the Sage Grouse Amendment.[3]

---

[3] Later in its objections, NEC contends that the Middle Ruby River Watershed Environmental Assessment violated the Resource Management Plan in existence at the time because BLM failed to show that it understood the threat cheatgrass poses in the watershed. (Doc. 40 at 17–18); *see* (Doc. 13-21 at 213) (preventing prescribed burns in sage grouse habitat absent a showing that the "potential for weed invasion and successional trends are well understood," among other requirements). Though NEC couched this argument in terms of NEPA, it would also be a violation of FLPMA if BLM did, in fact, fail to show it understood the potential for weed invasion and successional trends in the watershed. Nevertheless, this is not the case, as the Court explains later in this order. BLM showed it understood the potential for cheatgrass invasion and successional trends in the Middle Ruby River Watershed Environmental Analysis. (MRRW at 170, 355, 374.) Therefore, the project does not violate FLPMA, even if NEC had clearly made the argument that it did.

*2. Centennial Watershed*

NEC objects to the recommendation to deny its motion for summary judgment as to the Centennial project.   NEC points to its brief in support of its motion for summary judgment, in which it argued the Centennial Watershed Final Decision was made without regard to the Sage Grouse Amendment in force at the time.   (Doc. 40 at 4 (citing Doc. 18 at 25).)   In its brief, NEC incorporated by reference several undisputed statements of fact, including the following:

> The Centennial [Final Decision]'s approval of sagebrush treatments is not consistent with the Dillon [Resource Management Plan], as amended by the Sage Grouse Amendment, including but not limited to the failure to conduct risk assessments and demonstrate compliance with Conservation Objectives prior to approving prescribed burning of sagebrush habitat.

(Doc. 22 at ¶ 79.)   BLM did not dispute this fact.   (Doc. 32 at ¶ 79.)   Judge Cavan found NEC's briefing was not substantive enough to allow for a recommendation to grant NEC's motion for summary judgment as to the Centennial Watershed project. BLM urges the Court to accept Judge Cavan's recommendation.   It argues NEC's incorporation of its statement of undisputed facts was inadequate because L.R. 56.1(a)(1) limits statements of undisputed facts to "set[ting] forth in serial form each *fact* on which the party relies to support the motion."   (Emphasis added.)   BLM argues NEC ignored the rule and used its Statement of Undisputed Facts to make

10

legal arguments.

The Court agrees with NEC. In its briefing, NEC explained that FLPMA requires BLM to manage public lands in accordance with applicable Resource Management Plans. (Doc. 18 at 6 (citing 43 U.S.C. § 1732(a)).) NEC later explained that BLM had failed to supplement or amend the Centennial Watershed Environmental Assessment after the Sage Grouse Amendment was issued and before BLM issued the Centennial Watershed Final Decision, even though the Centennial Watershed Environmental Assessment was no longer consistent with the Resource Management Plan, as amended. (*Id.* at 25–26.) NEC then incorporated its Statement of Undisputed Facts, which explain in greater detail how the Centennial Watershed Environmental Assessment was inconsistent with the Resource Management Plan after Sage Grouse Amendment's adoption. (*Id.*)

Although the briefing was sparse, nothing more was needed. Because BLM issued its Centennial Watershed Environmental Assessment before the Sage Grouse Amendment's adoption, the Centennial Watershed Environmental Assessment naturally lacked a NEPA analysis addressing the issues Management Decision Fire 31 lists. When BLM failed to supplement the Centennial Watershed Environmental Assessment by including the required analysis before issuing the Centennial Watershed Final Decision, it clearly violated the Sage Grouse Amendment's new

11

requirements.

It matters little that NEC incorporated portions of its Statement of Undisputed Facts into its brief. The Court is unconvinced that BLM's invocation of L.R. 56.1(a)(1) requires the Court to ignore what is plain to see—BLM admitted the Centennial Watershed Final Decision violates the Sage Grouse Amendment. (Doc. 32 at ¶ 79.) Moreover, it is unclear why NEC would need to show withdrawal of the project was related to any violations NEC alleges. *See* (Doc. 39 at 18).

BLM did not dispute that it implemented a portion of the project in violation of the Sage Grouse Amendment, and therefore, FLPMA. NEC is plainly entitled to relief on this conclusion alone. The only remaining question is, as NEC explains, what relief NEC is entitled to for portions of the project that BLM implemented, as well as appropriate fees under the Equal Access to Justice Act.

### 3. *South Tobacco Root Watershed*

Judge Cavan provided a detailed analysis of the South Tobacco Root Watershed Environmental Assessment and whether it addressed the Management Decision Fire 31 factors. (Doc. 39 at 32–34.) He concluded it addressed each factor, and the Court concurs. (*Id.*) First, BLM addressed why it did not select alternative techniques from prescribed burning as viable options. (Doc. 13-15 [hereinafter *STRW*] at 295); *see* (Doc. 39 at 32–33). In several locations, BLM

12

discussed why alternative techniques, such as mechanical treatment alone, would only allow conifers to rapidly re-establish themselves in the watershed's sage steppe habitat. *See* (STRW at 245–49, 297–03). Second, BLM addressed how sage grouse goals and objectives would be met through prescribed burning. Specifically, BLM found that prescribed burning would reduce the "loss of existing habitat through conifer expansion and enhanc[e] early seral sagebrush habitat to match expected potential for the ecological site," among other benefits. (*Id.* at 296.) Third, BLM described how the Conservation Objectives Team Report ("COT Report") objectives would be addressed and met. Chapter 1.2 of the South Tobacco Root Environmental Assessment directly aligns with the COT Report objectives. *Compare* (*id.* at 148) *with* (*id.* at 296). Fourth, BLM performed a risk assessment to address how potential threats to greater sage grouse habitat would be minimized. (*Id.* at 297.) The South Tobacco Root Environmental Assessment contains several sections addressing the potential positive and negative impacts of prescribed burning in sage grouse habitat and range. *See* (*id.* at 178–79, 296–303).

NEC objects to this conclusion and focuses on the requirement that the NEPA analysis must describe how COT Report objectives will be addressed and met, with particular emphasis on the Sage Grouse Amendment's fire conservation measure requiring BLM to "[e]liminate intentional fires in sagebrush habitats, including

13

prescribed burning of breeding and winter habitats." (SGRMP at 543.) NEC argues BLM's "failure to map out, or otherwise disclose, affected seasonal habitats" violates the conservation measure. (Doc. 40 at 6.)

While the conservation measure from the COT Report does aim to eliminate intentional fires in sagebrush habitats, several sections in the Sage Grouse Amendment detail how prescribed burning is permissible to reverse conifer expansion, which presents its own threat: "reduced sage-grouse habitat availability and suitability over large areas with population-level consequences." (SGRMP at 270.) Prescribed burning has been recognized as "a tool that can assist in the recovery of sagebrush habitat in some vegetation types." (SGRMP at 663.) The Sage Grouse Amendment incorporates a Fire and Invasives Assessments Tool that requires consideration of "prescribed burning which would meet objectives identified in the [COT] report." (SGRMP at 0382.) The COT Report itself lists conifer removal as a conservation objective and recognizes that prescribed burning can be useful when employed with caution. (SGRMP at 550–51.) The COT Report aims to prevent intentional sagebrush removal or manipulation but recognizes, "Exceptions to this can be considered where minor habitat losses are sustained while implementing other habitat improvement or maintenance efforts (e.g., juniper removal) and in areas used as late summer brood habitat." (SGRMP

14

at 547.)

The Sage Grouse Amendment also recognizes an exception to prescribed fires

in sagebrush steppe

> if the NEPA analysis for the burn plan were to provide a clear rationale
> for why alternative techniques were not selected as a viable option.
> The analysis also would need to explain how GRSG habitat
> management goals and objectives would be met by its use and how the
> COT Report objectives would be met.   It would require a risk
> assessment to address how potential threats to GRSG habitat would be
> minimized.

(SGRMP at 443.)   These are the same requirements for the NEPA analysis of a burn

plan under Management Decision Fire 31.   (SGRMP at 48.)   Therefore, the Court

finds that, despite the conservation measure NEC cites, the Sage Grouse Amendment

does not prohibit prescribed fire in sage grouse habitat but allows for its use when

certain limited conditions are met.

Next, Judge Cavan found that the South Tobacco Root Watershed

administrative record showed where BLM would conduct conifer treatments (i.e.,

BLM mapped out and disclosed their locations).   (Doc. 39 at 35–36.)   The Court

agrees.   The administrative record described three alternatives—A, B, and C—for

conifer treatments.   (STRW at 23–26.)   The South Tobacco Root Watershed Final

Decision selected Alternative C.   (*Id.*)   The record, especially Table 16, discusses

treatment units, acreage, objectives, treatment types, and affected allotments.   (*Id.*)

15

Map 3 in Appendix A of the record identifies the specific locations for treatments. (*Id.* at 395.)   Map 1 shows allotments and general sage grouse habitat.   (*Id.* at 393–94.)   Thus, as Judge Cavan found, Map 1, Map 3, and Table 16 "effectively disclose locations of proposed prescribed burns and sage grouse general habitat management areas."   *See* (Doc. 39 at 36).   NEC objected that BLM failed to map out or disclose affected areas, but it failed to refute or acknowledge these findings.   The Court adopts them.

NEC is also particularly critical that BLM states a "majority" of the acres of general sage grouse habitat in the South Tobacco Root project area are "no longer suitable sage grouse habitat" and therefore, "no breeding or winter habitat is being treated."   NEC believes this line of reasoning to be illogical and inconsistent: "[A]sserting that a 'majority' of the 12+ square miles of sagebrush habitat is no longer suitable *does not logically mean that none of it is*, and therefore BLM has *not* shown that no breeding or winter habitat will be affected."   (Doc. 40 at 8.)

The South Tobacco Root Watershed administrative record describes two unconfirmed sage grouse leks—that is, breeding areas—in the Alder Gulch allotment.   (STRW at 252–53.)   The record states the leks were never confirmed because they "never actually had any documentation of displaying male sage grouse" and, because the areas have extensive juniper expansion, they are no longer

16

"suitable sage grouse habitat." (*Id.* at 486.)   According to the record, there were only three allotments in the South Tobacco Root without extensive conifer expansion. (*Id.* at 251–52.)   The record does describe a third lek that was located in the spring of 2016 near Virginia City Hill.   Conifer expansion has not taken over this new lek, however, and BLM states it therefore will not be treated.   (Doc. 30 at 27–28.)

Thus, the record describes only one breeding habitat in the South Tobacco Root Watershed, and that habitat is in an area that will not be treated.   Accordingly, the Court agrees with Judge Cavan: BLM and the administrative record adequately explain why conifer encroachment has made several areas unsuitable for breeding or winter habitat.   (Doc. 39 at 39.)   In the allotment where a lek does appear to exist, BLM does not plan to use prescribed burning to remove any conifers—there are none to remove.

NEC further argues BLM failed to comply with Management Decision Special Status Species (SSS) 7, which states: "[greater sage grouse] habitat within the project area will be assessed during project-level NEPA analysis within the management area designations . . . .   Project proposals and their effects will be evaluated based on the habitat and values affected."   (SGRMP at 35.)   NEC implies BLM failed to identify breeding and winter habitats in the South Tobacco Root

Watershed.   (Doc. 40 at 10.)   However, the record the Court reviewed above shows BLM did evaluate its project proposals and their effects based on the habitat and values affected.   Moreover, BLM does not plan to treat any winter or breeding habitats in the watershed.   Other than conclusory statements, NEC provides no other reason for why BLM failed to comply with Management Decision SSS 7 regarding the South Tobacco Root Watershed, and the Court finds none.

The South Tobacco Root Watershed Environmental Assessment and Final Decision comply with the Sage Grouse Amendment, including Management Decision Fire 31, and therefore comply with FLPMA.   NEC's objections and counterarguments are unavailing, and it has failed to demonstrate how BLM's decisions regarding the South Tobacco Root Watershed project were rendered "without observance of procedure required by law."   (Doc. 40 at 10); *see* 5 U.S.C. § 706(2).

### 4. Blacktail Watershed

Unlike the South Tobacco Root Watershed project, Judge Cavan did not directly analyze whether the Blacktail Watershed Environmental Assessment and Final Decision adequately addressed the Management Decision Fire 31 factors. Nevertheless, the Court finds BLM addressed each factor.

First, BLM addressed why it did not select alternative techniques from

18

prescribed burning as viable options.  (Doc. 13-2 [hereinafter *BTW*] at 216).  In several locations, BLM discussed why alternative techniques, such as mechanical treatment alone, were disadvantageous and would only allow conifers to rapidly re-establish themselves in the watershed's sage steppe habitat.  *See* (BTW at 216, 222–23).  Second, BLM addressed how sage grouse goals and objectives would be met through prescribed burning.  As it did for the South Tobacco Root Watershed, BLM found that prescribed burning in the Blacktail Watershed would reduce "loss of existing habitat through conifer expansion and enhance[e] early seral sagebrush habitat to match expected potential for the ecological site," among other benefits.  (*Id.* at 216.)  Third, BLM described how the COT Report objectives would be addressed and met.  Chapter 1.2 of the Blacktail Watershed Environmental Assessment directly aligns with the COT Report objectives.  *Compare* (*id.* at 107) *with* (*id.* at 215–18).  Fourth, BLM performed a risk assessment to address how potential threats to greater sage grouse habitat would be minimized.  (*Id.* at 216.)  The Blacktail Watershed Environmental Assessment contains several sections addressing the potential positive and negative impacts of prescribed burning in sage grouse habitat and range.  *See, e.g.,* (*Id.* at 135–36, 216–18, 221–26).

NEC argues the Blacktail Watershed Final Decision and Environmental Assessment fail to address and protect breeding habitat in the watershed.  (Doc. 40

at 7.)   First, as the Court found above, the Sage Grouse Amendment does provide for prescribed burning when certain conditions are met.   Second, there are two known, active leks on BLM-administered lands in the Blacktail Watershed.   (BTW at 331.)   However, the Blacktail Watershed Final Decision and the Environmental Assessment each describe how, prior to initiating a prescribed burn, the "[b]urn units will be surveyed for special status species," which include greater sage grouse, and how treatments "will not occur from 6:00 pm to 9:00 am within 2 miles (3.2 km) of sage grouse leks during lekking season."   (*Id.* at 9, 77.)   Furthermore, the "prescribed fire treatments were designed to maintain a large block of undisturbed high-quality habitat to provide diversity and resiliency."   (*Id.* at 222.)   In the proposed treatment areas, conifer colonization is expansive, and the "habitat is currently not considered suitable for sage grouse habitat and is not currently occupied."   (*Id.* at 221–22.)   Therefore, the Court finds the Blacktail Watershed Environmental Assessment and Final Decision do address and protect breeding habitat in the watershed.

The Blacktail Watershed Environmental Assessment and Final Decision comply with the Sage Grouse Amendment, including Management Decision Fire 31, and therefore comply with FLPMA.   NEC has failed to demonstrate how BLM's decisions regarding the Blacktail Watershed project were rendered "without

observance of procedure required by law." *See* 5 U.S.C. § 706(2).

   *C. NEPA and Cheatgrass*

   NEC's next primary objection is that BLM's watershed projects violate NEPA, especially concerning the projects' analyses of the cumulative impacts of cheatgrass, contrary to Judge Cavan's conclusions.  (Doc. 40 at 13.)  NEC first contends that the Sage Grouse Amendment "marked a departure from past practices," but in violation of the amendment, "just as much burning is prescribed in the post-Amendment decisions as the pre-Amendment decision, and the same 'Finding of No Significant Impact' is made for all these decisions."  (*Id.* at 14.) The Sage Grouse Amendment did mark a departure from past practices, and it now requires BLM to address additional issues when considering prescribed burning under Management Decision Fire 31—all of which BLM did.   Yet, just because the Sage Grouse Amendment subjects prescribed burning in sage grouse habitats to additional scrutiny does not mean BLM's analysis cannot reach the same result.

   NEC next argues "recognizing that cheatgrass 'needs to be controlled' is not the same as demonstrating that BLM actually knows how to control it."  (*Id.* at 15.) NEC questions whether BLM's cooperative effort with Madison County has eliminated cheatgrass or stopped its spread.  (*Id.* at 16.)   NEC also argues BLM has failed to provide a "convincing statement of reasons" for why potential adverse

impacts from cheatgrass due to BLM's proposed watershed projects are insignificant. (*Id.*)   However, NEC cites nothing in the record and provides no legal analysis for why BLM must demonstrate it can control cheatgrass or that its effort with Madison County has been effective at doing so.   Nevertheless, the Court interprets NEC's arguments as a claim that BLM has failed to take a "hard look" at the impacts of cheatgrass.

As the Court explained above, judicial review of a NEPA action is narrow and limited to whether the agency "took a 'hard look' at the environmental impacts of a proposed action." *Nat'l Parks & Conservation Ass'n*, 606 F.3d at 1072.   "Once satisfied that a proposing agency has taken a 'hard look' at a decision's environmental consequences, the review is at an end." *State of Cal. v. Block*, 690 F.2d 753, 761 (9th Cir. 1982).   NEPA "does not mandate particular results, but simply prescribes the necessary process," and it "merely prohibits uninformed— rather than unwise—agency action." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350–51 (1989).

An Environmental Assessment must contain a "convincing statement of reasons" explaining "why a project's impacts are insignificant." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998).   The statement of reasons is "crucial to determining whether the agency took a 'hard look'

at the potential environmental impact of a project." *Id.* (quoting *Save the Yaak Committee v. Block*, 840 F.2d 714, 717 (9th Cir. 1988)).   However, this does not mean the Court substitutes the agency's judgment with its own.   The Court's task "is simply to ensure that the agency 'considered the relevant factors and articulated a rational connection between the facts found and the choices made.'" *N.W. Ecosystem All. v. U.S. Fish and Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (quoting *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 841 (9th Cir. 2003)).

The Court finds BLM took a hard look at the issue of cheatgrass and provided a convincing statement of reasons for why the watershed projects' impact is insignificant.   BLM analyzed the potential threat cheatgrass poses and incorporated precautionary measures for the projects.   In the South Tobacco Root Watershed and Blacktail Watershed Environmental Assessments, BLM provided a detailed analysis for cheatgrass, including the threat it poses, benefits and drawbacks of prescribed fire, and options for mitigating its impact.   (STRW at 178, 296–97; BTW at 225–26, 307, 310.)   BLM explained how prescribed fire treatment units would be monitored for noxious weeds and cheatgrass and how the units would be treated both before and after the prescribed fires.   (BTW at 135; STRW at 178.)   BLM excluded from the treatment units "[a]reas where cheatgrass or noxious weed densities are greater than 50% of vegetative composition and the size of the infestation is larger

23

than five acres." BLM also stated that burned areas would "be treated intensively during the spring and summer following the burn to prevent re-emerging or germinating noxious and invasive species from producing seed." (BTW at 135; STRW at 178.)

In the Middle Ruby River Watershed Environmental Assessment, BLM's analysis of cheatgrass is less detailed. However, the Court still finds it meets NEPA's requirement to take a hard look at the issue. In it, BLM discusses cheatgrass's prevalence in the watershed, its potential to continue spreading, BLM's cooperative control effort with Madison County, and the acres treated and inventoried through the cooperative effort in recent years. (MRRW at 170, 355.) BLM also discusses future precautionary measures like collaborating with local agencies and landowners to address infestations, educating the public on identification and prevention measures, and monitoring and treating infestations found within areas targeted for prescribed burning both before and after the burning takes place. (MRRW at 374.)

Accordingly, the Court finds BLM took a hard look at the issue of cheatgrass in these three watersheds and has provided a convincing statement of reasons for why the projects' impact on cheatgrass will be insignificant. NEC's objection is overruled under NEPA's deferential standard.

24

### D. Middle Ruby River Watershed Environmental Assessment Update

NEC finally makes a passing claim that BLM should have supplemented the Middle Ruby River Environmental Assessment after adoption of the Sage Grouse Amendment "at a minimum."   (Doc. 40 at 19.)   However, it provides no relevant authority in support for why BLM's failure to do so violates NEPA.   *See* (Doc. 40 at 14.)

NEC cites 43 C.F.R. § 1610.5-3 in support of its argument.   However, § 1610.5-3 states that after a Resource Management Plan is amended, BLM must "make operations and activities under existing permits, contracts, cooperative agreements or other instruments for occupancy and use, conform to the . . . amendment within a reasonable period of time."   The regulation says nothing about Environmental Assessments or Final Decisions and does not apply to them.   As BLM points out, both NEPA's and BLM's regulations expressly allow an agency to take an action that is "within the scope of, and analyzed in," an existing Resource Management Plan, even if the agency is preparing to amend it.   43 C.F.R. § 1506.1(c); 43 C.F.R. § 46.160.    Therefore, NEC incorrectly claims that BLM should have supplemented the Middle Ruby River Watershed Environmental Assessment after adopting the Sage Grouse Amendment.

### IV.   Conclusion

BLM correctly analyzed its South Tobacco Root Watershed and Blacktail Watershed projects under the requirements of the Sage Grouse Amendment, especially Management Decision Fire 31. Both Environmental Assessments and Final Decisions conform with the Resource Management Plan, as amended, and do not violate FLPMA. Likewise, the Middle Ruby River Watershed project does not violate FLPMA.

All three projects also comply with NEPA's requirements. The Court finds that BLM took a hard look at the environmental impacts of its actions in these three watersheds, including the projects' impacts on existing invasive species such as cheatgrass.

However, BLM did not meet the Sage Grouse Amendment's requirements for the Centennial Watershed project, and NEC is entitled to summary judgment on its claim that the Centennial Watershed Final Decision violates FLPMA. The only remaining question is what relief NEC is entitled to for the portions of the project already implemented, as well as appropriate fees under the Equal Access to Justice Act. Accordingly,

**IT IS HEARBY ORDERED**:

1. The Findings and Recommendations (Doc. 39) are **ADOPTED IN PART**;

2. BLM's cross-motion for summary judgment based on NEC's standing to bring this action and with respect to the Centennial Watershed (Doc. 28) is **DENIED**;

3. NEC's cross-motion for summary judgment with respect to the Centennial Watershed (Doc. 16) is **GRANTED**;

4. NEC's cross-motion for summary judgment with respect to the Middle Ruby River, South Tobacco Root, and Blacktail Watersheds (Doc. 16) is **DENIED**;

5. BLM's cross-motion for summary judgment with respect to the Middle Ruby River, South Tobacco Root, and Blacktail Watersheds (Doc. 28) is **GRANTED**;

6. This case is referred to Magistrate Judge Cavan for further proceedings consistent with this order.

The clerk shall notify counsel of this order.

DATED this 29ᵗʰ day of April 2020.

Susan P. Watters
U. S. DISTRICT JUDGE